In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-16-00232-CR
_____

**JASON THOMAS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 13-17074**

**MEMORANDUM OPINION**

Jason Thomas (Thomas or Appellant) appeals his conviction for felony

assault-family violence/choking. *See* Tex. Penal Code Ann. § 22.01(a)(1), (b)(2)(B)

(West Supp. 2017).[1] Thomas waived his right to a jury trial. After a bench trial, the

trial court found Thomas guilty and assessed his punishment at imprisonment for

_____

[1] We cite to the current version of the statute, as subsequent amendments do
not affect the disposition of this appeal.

seven years. Thomas timely appealed. In two appellate issues, Thomas challenges the legal sufficiency of the evidence supporting his conviction and he asserts that there is a fatal variance between the allegations in the indictment and the proof at trial. We affirm.

## The Indictment

The State charged Thomas by indictment with assault-family violence as follows:

> . . . Jason Brian Thomas, hereafter styled the Defendant, on or about the 26TH day of April, TWO THOUSAND AND THIRTEEN, and anterior to the presentment of this indictment, in the County of Jefferson and State of Texas, did then and there intentionally, knowingly, and recklessly cause bodily injury to [S.W.[2]], hereafter styled the Complainant, by applying pressure to Complainant's throat and neck and by blocking the Complainant's nose and mouth, impeding the normal breathing and circulation of the blood of the Complainant, and at the time of commission of the offense, the Defendant and Complainant were family members[.]

## Evidence at Trial

S.W. testified that she was married to Thomas for twenty years until they were divorced in 2014. She testified that on April 26, 2013, while they were still married, she went into a bedroom at their home and asked Thomas for money to buy their son

---

[2] We use initials to refer to the alleged victim and family members. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

2

some items for an upcoming school field trip. S.W. testified that at that time their daughter was fifteen or sixteen years old and their son was about thirteen or fourteen years old. S.W. testified that she was nervous to ask for the money because Thomas "was very controlling with money." According to S.W., she and Thomas had a discussion about the money and Thomas approached her in an aggressive manner. S.W. testified that she was afraid he was going to physically harm her, so she left the bedroom and closed the door. She heard their son tell her to run, and when she ran and looked back, she saw Thomas coming out of the room and running behind her. According to S.W., Thomas pushed her down to the floor, choked her, and told her that he was going to kill her. S.W. testified that she felt pain when she hit her head and when he pushed her to the floor. She also testified that she felt pain and "could not breathe[]" when he put his hands around her neck, squeezed and applied pressure to her neck, and "had his body pinned on top of [her]." According to S.W., she was afraid for her life and, as she was trying to remove his hands from around her neck, she was not strong enough and "[e]verything went black[.]"

She testified that the next thing she remembers was feeling woozy on the couch, and her son and daughter were looking at her head and neck and discussing whether to call 9-1-1. S.W. explained at trial that she did not want the children to call 9-1-1 or EMS, and she did not report the incident that night because Thomas

3

had threatened her, she was afraid of him, and he was still in the house. According to S.W., she reported the incident "a few weeks later[]" when the Sheriff's Department arrived at her house and served Thomas with a "restraining order of some kind from his former employer." She asked law enforcement to leave the house because she was worried that Thomas would come home and see the police there and think that she had called them because of the choking incident. S.W. testified that law enforcement later served Thomas with the papers, and Thomas began behaving erratically and threatening to kill S.W., their kids, and Thomas's former employer. S.W. testified that she filled out an application for a mental health warrant, and the Sheriff's Department served the mental health warrant on Thomas around June 6th or 7th, 2013. S.W. explained that she reported the prior incident and gave a handwritten statement to the officer at the scene where Thomas was apprehended on the mental health warrant, and she gave another statement at the police station. According to S.W., she waited until Thomas was apprehended on the mental health warrant to report the prior incident because of "what he would have done to my kids." S.W. testified that Thomas never denied choking her and that, during their divorce proceeding, Thomas testified and admitted that he had choked her during that April incident.

J.T., Thomas's and S.W.'s sixteen-year-old son, testified that on April 26, 2013, his mother had asked his father about getting some things for the field trip and his mother and father began arguing. According to J.T., he heard them arguing, and he saw his mother come out of his parents' bedroom and shut the bedroom door on Thomas. J.T. testified that Thomas punched through the bedroom door and ran after his mother. J.T. explained that he was scared for his mother and J.T. told her to look behind her. J.T. testified that he saw Thomas push and knock his mother down, get on top of her, and choke her. According to J.T., his mother was struggling to breathe, looked like she was in pain, lost consciousness, and was not moving for six or seven seconds. J.T. testified that he and his sister helped his mother get up and that his mother was struggling to breathe and complaining that her head hurt. J.T. testified that his mother did not call anyone, and he and his sister did not call anyone either because he "guess[ed] [his] mom wanted to try to work things out[]" with his father and because J.T. "wasn't brave enough[]" to suggest that she call someone. J.T. explained at trial that he was scared of his father and that his father would have moments where he would abuse his mother. J.T. acknowledged that his statement to law enforcement regarding the incident did not mention the choking, and he testified that he did not know the charges were going to specifically allege choking, but he remembered seeing his father choking his mother on the day of the incident.

E.T., S.W.'s and Thomas's nineteen-year-old daughter, testified that she was sixteen years old on April 26, 2013. According to E.T., that day she was in her room and her parents were arguing because her father did not want to give her mother money to buy her brother things for a field trip. E.T. testified she heard her father go "crashing through the door[,]" and when E.T. came out of her room, E.T. heard her brother tell their mother to "watch out[,]" and she saw her father chase her mother while threatening to hurt her mother, and then Thomas pushed her mother to the ground. E.T. testified that she and her brother were scared and that her mother was trying to run away from her father because her mother was scared. According to E.T., after Thomas pushed her mother to the ground, Thomas got on top of her mother and started choking her, and E.T. saw Thomas "squeezing" his hands around her mother's neck and then "kinda letting go." E.T. testified that she and her brother asked Thomas to get off their mother, and that E.T. believed that her father was going to kill her mother when he had his hands around her mother's neck. E.T. testified that during the incident her mother's head hit the concrete, that her mother was struggling to breathe, and then lost consciousness "for a little bit." E.T. testified she and her brother helped their mother onto the couch. According to E.T., their mother did not want them to call the police because their mother was scared of Thomas and did not want the police involved at that point. E.T. testified that on

6

occasions Thomas threatened to kill her mother and E.T. believed he would carry out the threats.

Detective Powell with the Jefferson County Sheriff's Department testified that he was a patrol deputy on May 31, 2013, when he served a criminal trespass warrant from Drainage District 6 on Thomas. He testified he also assisted in serving a mental health warrant on Thomas on June 7, 2013. Detective Powell testified that the mental health warrant was based on Thomas's paranoid schizophrenic diagnosis.

Detective Powell explained at trial that, because he had dealings with Thomas a week prior and that he was concerned for the safety of S.W. and her children, Detective Powell suggested that the officers serve Thomas with the mental health warrant prior to Thomas getting home. According to Detective Powell, once the mental health warrant had been served and Thomas was taken into custody, S.W. arrived at the scene and she was crying and appeared relieved and thanked the detective. Thomas was transported to Fannin Behavioral Center. Detective Powell testified that S.W. then told him that in April Thomas choked her, that she thought during that incident that he was going to kill her, and that she was too scared to report it when it happened. Detective Powell testified that he believed her and that he felt that he had enough evidence to charge Thomas with assault-family violence.

Detective Elizabeth Foshee with the Jefferson County Sheriff's Office testified that she was a peace officer in June 2013, and she was called to investigate an alleged assault-family violence/choking incident involving S.W. and Thomas. According to Detective Foshee, S.W. and S.W.'s children, E.T. and J.T., came to Foshee's office and gave statements regarding the incident in question. Detective Foshee took E.T.'s statement and another officer took J.T.'s statement. Detective Foshee testified that S.W. was "[d]eathly afraid[]" of Thomas, and that with S.W.'s and the children's statements, Detective Foshee believed she had enough evidence to charge Thomas with assault-family violence/choking. Detective Foshee testified that S.W. reported that Thomas had an extensive amount of weapons and ammunition at their home and that S.W. wanted the police to remove the weapons and ammunition. According to Detective Foshee, S.W. felt threatened by Thomas and thought that he would carry out his death threats. S.W. allowed the Detective to retrieve many weapons and some ammunition from the home so that law enforcement could hold them temporarily for safekeeping.

A court reporter from Thomas and S.W.'s divorce proceeding testified that she transcribed Thomas's testimony at the proceeding, and the transcript was admitted into evidence. According to Thomas's sworn testimony from the divorce proceeding, Thomas admitted to "wringing the crap out" of S.W.'s neck, and

Thomas stated that when he realized that S.W. "looked like a puppy" and realized what he was doing, he stopped.

Thomas testified at trial that at the time of the incident he was deprived of sleep. According to Thomas, S.W. woke him up, she was screaming and using a broom to sweep things off a dresser towards him, she told him she was tired of him embarrassing her, and she started to beat him with the broom. Thomas testified that he grabbed her by the neck without putting pressure on her neck and "picked her up where she was on her tippy toes." He testified that although he put his hands on her neck, he did not apply pressure to cut off airflow. Thomas testified that after about seven seconds he "c[a]me to [his] senses," thought she looked like a puppy, let her go, and then hugged her. Thomas denied that he banged her head on the concrete, that he got on top of her, that she passed out, or that he choked her. Thomas explained that after he was treated at a hospital, he was then transported to the Jefferson County Jail. Thomas testified that he told the truth in the divorce proceeding and that his wife had never been scared of him. According to Thomas, his children and wife were mixing two different incidents together. Thomas testified that there was a different incident where he was sitting on the toilet and S.W. "plucked a lit cigarette in [his] eye" and he busted through a door and chased her and pushed her. Thomas agreed

9

that he had a previous diagnosis of delusional disorder and that, in 2006, S.W. had a protective order against him in Harris County.

M.T., Thomas's sister, testified that she lives in the Houston area and that when she had talked to her brother, including in telephone conversations around April 2013, "he always seem[ed] normal," but that when she talked to S.W., S.W. described Thomas in a way that M.T. testified she had not seen. M.T. also testified that she had never known of a time when Thomas lied to her. According to M.T., she had conversations with S.W. in 2012, she had never observed any abusive behavior by Thomas towards S.W., and S.W. did not tell M.T. that S.W. was afraid of Thomas. M.T. acknowledged that she had not been in contact with the children since 2005.

## Analysis

In his first issue, Thomas challenges the legal sufficiency of the evidence supporting his conviction. Thomas does not dispute that S.W. was a member of his family at the time of the incident. Instead, Thomas argues that "[g]laringly absent is any evidence [that he committed the act alleged in the indictment], other than mere speculation[,]" and that the "witnesses to the alleged offense admitted in their testimony that the statements they provided to law enforcement several weeks after the offense did not make any mention of Appellant having choked the complainant."

10

In his second issue, Thomas argues there is a fatal variance between the allegations in the indictment and the proof at trial. Specifically, Thomas asserts that the indictment alleged that he committed the offense by choking the complainant but "[t]he evidence, however, clearly establishes the complainant suffered injury by striking her head against the floor." Because fatal variance claims are treated as a claim regarding the legal sufficiency of the evidence, we address both issues together. *See Gollihar v. State*, 46 S.W.3d 243, 247 n.6 (Tex. Crim. App. 2001).

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011). In a bench trial, the trial judge is the sole trier of fact and judge of the credibility of the witnesses, and the trial court may choose to believe or not to believe some or all of the witnesses who testify at trial. *See Johnson v. State*, 571 S.W.2d 170, 173 (Tex. Crim. App. 1978). The applicable standard of review requires us to resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the factfinder is the exclusive judge of the facts, the credibility of the witnesses, and shall determine the weight to give their testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). On appeal, our role is only to

ensure the factfinder reached a rational verdict; we do not reevaluate the weight and credibility of the evidence produced at trial and we do not substitute our judgment for that of the fact finder. *See King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *See Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

"A 'variance' occurs when there is a discrepancy between the allegations in the charging instrument and the proof at trial. In a variance situation, the State has proven the defendant guilty of a crime, but has proven its commission in a manner that varies from the allegations in the charging instrument." *Gollihar*, 46 S.W.3d at 246 (citing 42 George E. Dix & Robert O. Dawson, Texas Practice: Criminal Practice and Procedure § 31.81 at 178 (1995)). Generally, a variance that is not prejudicial to a defendant's substantial rights is immaterial. *See id.* at 247-48. Whether a defendant's substantial rights have been prejudiced by a variance between the indictment and the evidence at trial typically depends upon the answers to two inquiries: (1) whether the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial, and (2) whether prosecution under the deficient indictment would subject the defendant to the risk of being prosecuted later for the same crime. *See id.* at 248. A

"material variance" (also known as a "fatal variance") is not shown unless it might mislead the defense, or might expose the defendant to the danger of being put twice in jeopardy for the same offense. *See id.* at 249, 257 n.23. When arguing variance, the burden of demonstrating surprise or prejudice rests with the defendant. *Santana v. State*, 59 S.W.3d 187, 194 (Tex. Crim. App. 2001).

Ordinarily, assault occurs when one "'intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse.'" *Marshall v. State*, 479 S.W.3d 840, 844 (Tex. Crim. App. 2016) (quoting Tex. Penal Code Ann. § 22.01). But assault may be enhanced to a third degree felony if committed against a family member "'by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth.'" *Id.* (quoting Tex. Penal Code Ann. § 22.01(b)(2)(B)).

S.W. testified that she did not initially report the choking incident, and J.T. testified that initially he did not include in his statements to law enforcement that Thomas had choked S.W. on the day of the incident. However, S.W., J.T., and E.T., testified at trial that on the day of the incident they personally witnessed Thomas choke S.W. and that S.W. was in pain, struggled to breathe, and lost consciousness. Thomas admitted putting his hands on S.W.'s neck but denied putting pressure on

her neck or restricting airflow. The trial court, as factfinder, was free to believe or disbelieve any part or all of the witnesses' testimony and reconcile inconsistencies. *See Brooks*, 323 S.W.3d at 899; *Johnson*, 571 S.W.2d at 173. Here, the verdict suggests that the trial court chose to believe S.W.'s, E.T.'s, and J.T.'s testimony over Thomas's testimony, and we defer to that determination. *See Merritt*, 368 S.W.3d at 525-26. Viewing all the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have reasonably concluded beyond a reasonable doubt that Appellant committed the offense of assault-family violence/choking. *See Jackson*, 443 U.S. at 318-19; *Byrd*, 336 S.W.3d at 246. Accordingly, the evidence is legally sufficient to support the conviction.

Thomas also argues the State's evidence at trial of the manner and means of the offense did not match the manner and means alleged in the indictment. Based upon the record before us, we disagree. Nevertheless, Thomas does not contend that the indictment language led to an inability to defend against the charge, nor does he indicate how this alleged variance could subject him to the risk of later being prosecuted for the same offense. *See Gollihar*, 46 S.W.3d at 248. On this record, assuming without deciding that there was any variance between the pleadings and the proof at trial, we conclude that any alleged variance was not prejudicial to

14

Thomas's substantial rights and was, therefore, immaterial. *See id.* at 247-48. We overrule issues one and two and affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on January 4, 2018
Opinion Delivered February 14, 2018
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.